IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| PATRICIA BOYETT, | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CA 3:04-CV-2023-AH |
| | § | |
| COMMISSIONER OF SOCIAL | § | |
| SECURITY, | § | |
| Defendant. | § | |

MEMORANDUM OPINION AND ORDER

Pursuant to the written consents of the parties to proceed before a United States Magistrate Judge and the District Court's Transfer Order filed on February 14, 2005 in accordance with the provisions of 28 U.S.C. § 636(c), came on to be considered Plaintiff Patricia Boyett's action brought under 42 U.S.C. § 405(g) seeking judicial review of the Defendant's denial of Plaintiff's application for disability benefits under Title II of the Social Security Act, 42 U.S.C. § 423.

Procedural History: On June 21, 2001, the Plaintiff filed her application for Social Security benefits alleging disability since March 1, 1998, due to back and neck pain. (Administrative Record ("Tr.") 53-57).

The Administrative Law Judge ("ALJ") conducted a hearing on July 22, 2003. (Tr. 280). On October 24, 2003, the ALJ denied the Plaintiff's request for supplemental security income benefits finding that the Plaintiff had the residual functional capacity to perform her past relevant work as a cashier. (*Id.* at 8, 17). The Plaintiff timely requested review of the ALJ's decision by the Appeals Council, and on July 23, 2004, the Appeals Council denied her request. (Tr. 3). Therefore, the ALJ's decision became the Commissioner's final decision for purposes of judicial review.

The Plaintiff filed her complaint on September 17, 2004.  Boyett filed a Motion for Summary Judgment or, in the Alternative, Judgment on the Pleadings on March 24, 2005.  The Defendant filed her Response on April 4, 2005.

Standard of Review--Social Security: In a Social Security case, the scope of judicial review is limited to a determination of whether the ALJ's decision to deny benefits is (1) supported by substantial evidence and (2) whether the proper legal standard was applied. *Kinash v. Callahan*, 129 F.3d 736, 738 (5th Cir. 1997) (citing *Ripley v. Chater*, 67 F.3d 552, 555 (5th Cir. 1995)).

Substantial evidence means more than a scintilla, but less than a preponderance. *Haywood v. Sullivan*, 888 F.2d 1463, 1466 (5th Cir. 1989).  It is defined as relevant evidence that a reasonable mind would accept as sufficient to support a conclusion. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994) (citing *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420 (1971)).

In determining whether substantial evidence exists, the court does not reweigh the evidence, retry the issues, or substitute its own judgment. *Id.* (citing *Haywood*, 888 F.2d at 1466); *Bowling v. Shalala*, 36 F.3d 431, 434 (5th Cir. 1994).  Rather, the court reviews the ALJ's legal conclusions *de novo* and ensures that the correct legal standard was utilized by the administrative court.

The Commissioner's decision is granted great deference. *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995).  Accordingly, the absence of substantial evidence will be found only where there is a "conspicuous absence of credible choices" or "no contrary medical evidence." *Hames v. Heckler*, 707 F.2d 162, 164 (5th Cir. 1983).  Findings of fact which are supported by substantial evidence are conclusive. *Martinez v. Chater*, 64 F.3d 172, 173 (5th Cir. 1995).

Discussion: To prevail on a claim for disability benefits, a claimant must establish a physical or mental impairment lasting at least twelve months that prevents her from engaging in any

substantial gainful activity. *Cook v. Heckler*, 750 F.2d 391, 393 (5th Cir. 1985) (citing 42 U.S.C. §§ 416(i)(1), 423(d)(1)(A)).  Under the first four steps, a claimant has the burden of proving disability, but under the fifth step, i.e. when a claimant is unable to perform her previous work, the burden shifts to the Commissioner to prove that there is other substantial gainful activity which she can perform. *E.g., Bowen v. Yuckert*, 482 U.S. 137, 147 n.5, 107 S.Ct. 2287, 2294 n.5 (1987); *Anderson v. Sullivan,* 887 F.2d 630, 632-33 (5th Cir. 1989).  As stated above, the ALJ found that the Plaintiff retained the residual functional capacity to perform her past relevant work as cashier.  (Tr. 17). Thus, the inquiry ended at step four of the sequential inquiry and the ALJ adjudicated the Plaintiff not disabled on or before December 31, 2002, the date on which her insured status expired.

The documents contained in the administrative record reflect the following chronology of medical care: On March 18, 1996, Boyett saw Dr.  David W.  Carlson, Jr., M.D., and reported that she had injured her back while at work.  She was prescribed medication.  (Tr.  267).

On April 2, 1996, the Plaintiff saw Dr.  Carlson and reported that she was much better.  Her medications were adjusted and she was instructed to continue work.  (Tr.  266).

On April 16, 1996, Boyett saw Dr.  Carlson and reported that the pain in her neck and back comes and goes.  His notes reflect that the Plaintiff should "work until 3 p.m. only," presumably reflecting a shorter day.  (Tr.  265).

On April 30, 1996, the Plaintiff saw Dr.  Carlson and reported that she was not doing well. He prescribed Elavil.  (Tr.  264).

On May 16, 1996, the Plaintiff saw Dr.  Carlson and reported that her neck was feeling better.  (Tr.  263).

Dr. Carlson's notes of May 29, 1996 reflect that Boyett was to continue physical therapy three times a week, with a recheck in two weeks. (Tr. 260).

On September 17, 1996, the Plaintiff reported to Dr. Carlson that she had good and bad days. She complained of spasms in the right side of her neck. Dr. Carlson put the Plaintiff on six hours light duty days and instructed her to follow up with a neurosurgeon. (Tr. 256).

On September 23, 1996, Boyett saw Dr. Charles Mitchell, M.D. The Plaintiff reported that she injured herself at work by twisting out of the way of some falling boxes. She had been seeing a different physician since then. Under that physician, she had some MRIs that came out normal and also some physical therapy. She brought various medications that she had been taking, which she reported did not work well. Dr. Mitchell found that the Plaintiff was extremely tender in the upper back and mid thoracic area. She complained of pain, but had a full range of motion in her cervical spine. She had 180 degrees of adduction, external rotation, full internal rotation of the shoulders, full flexion and extension of the elbows, and excellent strength of the upper extremities with good sensation throughout. She had no spasm in the upper cervicothoracic spine, just diffuse tenderness. In essence, her neurological uppers and lowers were essentially normal. Dr. Mitchell opined that the Plaintiff did not suffer from fibromyalgia, but rather from a cervicothoracic strain. He opined that Boyett would be a difficult patient to manage. He recommended that she go to work four hours a day, followed by a four hour work hardening program. (Tr. 213-15).

On September 26, 1996, Boyett saw Dr. Charles E. Willis II, M.D., for an initial consultation evaluation. He diagnosed chronic cervical strain, chronic trapezil strain, chronic lumbar strain, and occipital neuralgia. He gave the Plaintiff a cervical pillow, a lumbar cushion, and a prescription for Midrin for her headaches. He advised Boyett to avoid standing, walking or sitting

4

for longer than one hour, bending, stooping, or squatting longer than 30 minutes at a time, and overhead lifting, pushing, and pulling of any weight greater than 20 pounds until these restrictions were lifted by a physician.  (Tr.  242-45).

On September 30 ,1996, the Plaintiff saw Dr.  Mitchell complaining of pain in her upper neck and back.  She reported that she had gone to the pain clinic.  Dr.  Mitchell stated that he would start the Plaintiff on an aggressive rehabilitation program.  She was given Midrin for her headaches.  Dr.  Mitchell believed that the Plaintiff had some psychological problems that would impede her recovery, but that it was important that she return to full work.  He stated that he would see her again in two weeks to determine her overall treatment plan and that she should continue working four hours a day.  (Tr.  212).

On October 3, 1996, the Plaintiff reported to Dr.  Buckley that she was having difficulty at work because her manager preferred that she stand, rather than use a chair with a back.  (Tr.  241).

On October 8, 1996, Dr.  Buckley's records indicated that the Plaintiff called in to say that she was in such pain that she almost went to the emergency room.  He instructed her to ice it and prescribed medication.  (Tr.  241).

On October 16, 1996, Dr.  Willis's notes indicate that Boyett is to start rehab.  She was to continue on her medication and to do rehab for 6-8 weeks.  (Tr.  240).

On October 31, 1996, the Plaintiff saw Dr.  Mitchell for a follow-up examination.  She reported pain in her upper back and neck, with some stiffness.  She was still undergoing work rehabilitation.  Dr.  Mitchell prescribed some muscle relaxants and opined that the Plaintiff had a thoracic sprain which would not need any particular treatment.  (Tr.  211).

On November 6, 1996, the Plaintiff saw Dr. Willis and reported that rehab was helpful, but that she still had neck pain. She was instructed to continue rehab and to take her medication as needed. (Tr. 239).

On November 20, 1996, Boyett saw Dr. Willis and reported that, overall, she was doing better. She was instructed to continue rehab, with massage and hot baths as needed. Her prescription for Soma was refilled. (Tr. 238).

On December 4, 1996, the Plaintiff saw Dr. Willis and reported that her pain had increased from the previous week. He noted that she was awaiting approval for a TENS unit and directed her to continue rehab and her previously prescribed drug as needed, and to see Dr. Mitchell on the following day. (Tr. 237).

On December 5, 1996, Boyett saw Dr. Mitchell for a follow-up examination. She complained of upper back and neck pain. Dr. Mitchell opined that he did not need to do anything for the Plaintiff besides "serving care." She was to continue on limited duty for one month. He opined that her problem would gradually resolve and that she would not have any permanent or partial impairment in the long term. (Tr. 210).

On December 18, 1996, Boyett saw Dr. Willis and reported that she was doing about the same. She reported that her condition was worse with cold weather. She was to continue with Soma as needed and do stretching exercises. Dr. Willis noted that the Plaintiff needed a TENS unit. (Tr. 236).

On December 19, 1996, the Plaintiff saw Dr. Mitchell for a follow-up examination. He noted that she continued to have thoracic pain at about the same level as before. He opined that this was not a very major problem. He referred her to Dr. Willis for some injections and stated that he

would see her again in approximately three weeks to determine her disability, and that he anticipated releasing her to full work status at that time.  He also stated that the Plaintiff would need a TENS machine.  (Tr.  209).

On January 2, 1997, Boyett saw Dr.  Mitchell for a follow-up appointment.  She had not had her injections, so instead of seeing Dr.  Mitchell she was sent to the anaesthesiologist for her injections.  Dr.  Mitchell hoped to have the Plaintiff back to full time work in the next 2-3 weeks.  (Tr.  141).

On January 8, 1997, Boyett reported to Dr.  Willis that her employer did not believe that she had been injured at work and that she was having a difficult time at work because she was required to stand continuously.  She stated that she would change treating doctors to get off work.  She indicated that the TENS unit was doing well.  A TPI was performed on the Plaintiff.  (Tr.  235).

On January 9, 1997, the Plaintiff saw Dr.  Mitchell for a follow-up examination.  He noted that she had had two injections on January 8, 1997.   Her band-aids were removed and it was noted that she had slight spasm in the shoulder with slight swelling.  Dr.  Mitchell released the Plaintiff to full time work effective January 13, 1997.  (Tr.  140).

On January 15, 1997, the Plaintiff reported that TENS was helpful, but she was not sure if the TPI she received on January 8 was helpful or not.  Dr.  Willis recommended that she continue home exercise, continue use of a TENS unit, use muscle relaxants as needed, and purchase a hard mattress.  (Tr.  233).  On the same day he wrote a note indicating that the Plaintiff had not been discharged from treatment, that she should be excused from work through the date of the note, and that she could return to regular duty.  (*Id.*  at 234).

On January 29, 1997, Boyett reported to Dr. Willis that she was doing about the same. (Tr. 231). On the same day, Dr. Willis wrote a note excusing the Plaintiff from work through January 29, 1997. (*Id.* at 232).

On February 12, 1997, Boyett was seen by Dr. Mitchell for a follow-up examination. She complained of pain in her neck, back, and shoulder. She was scheduled for a repeat soft tissue injection, so Dr. Mitchell recommended that she be let off work for two days. He opined that she was recovering from a thoracic and cervical sprain and that she should be able to return to full work on Monday, February 17, 1997. (Tr. 139). On the same day, she was seen by Dr. Willis. She reported no change in her pain since the previous visit. (*Id.* at 230).

On February 19, 1997, Boyett reported to Dr. Willis that she had done well until she returned to work. A TENS unit was used on her and she was instructed to continue her home exercise. (Tr. 228). On the same date Dr. Willis wrote a note indicating that Plaintiff should be excused from work through February 19, 1997. (*Id.* at 229).

On March 18, 1997, Dr. Mitchell wrote a note indicating that Plaintiff could return to regular duty on the same day. (Tr. 208).

On March 19, 1997, Plaintiff reported to Dr. Willis that she was doing about the same. He prescribed, among other things, aloe liniment. (Tr. 226). On the same day Dr. Willis wrote a note indicating that Boyett could return to work, but that she was not to remain bent over for extended periods of time. (*Id.* at 227).

On March 26, 1997, Dr. Mitchell wrote a letter to Debbie Galan concerning the Plaintiff. In it he stated that the Plaintiff had reached maximum medical improvement and that the Plaintiff had some complaints of upper back and neck pain, however, he believed that this was mainly soft

tissue.  He opined that the Plaintiff might need further medical attention, including medication, therapy, and occasional injections.  He also recommended a TENS machine. (Tr. 138-37).

On April 2, 1997, Boyett reported to Dr. Willis that liniment helped, but that she still had problems with her arms from fatigue and that her arms felt heavy. (Tr. 225).

On April 7, 1997, Dr. Frank A. Lang, M.D. saw Plaintiff for a medical evaluation. He found the Plaintiff to be a short, thin woman who appeared to be her stated age, with no external supports.  She had no evidence of muscle spasm or guarding of the neck and good use of upper extremities.  Her sensation, reflexes, and motor power of the upper extremities were normal.  She retained her range of motion.  He found that her reflexes, sensation, and motor power of her lower extremities were normal.  He noted that the Plaintiff had been symptomatic over the past year despite good medical care.  He stated that the Plaintiff had not complained of lumbar difficulty, and it had therefore not been addressed in his report.  He opined that she had reached maximum medical improvement and in the future would need only palliative care.  He recommended that she be medicated for her anxiety and depression.  He opined that Boyett had an 11% whole person impairment.  He further opined that she should remain under the care of Dr. Mitchell and Dr. Willis for pain treatment and that she could return to work full time with a 35 pound lifting weight restriction. (Tr. 247-54).

On April 23, 1997, the Plaintiff reported to Dr. Willis that she had an increase in muscle tightness and an increase in shakiness in her arms. (Tr. 224).

On May 5, 1997, the Plaintiff was seen by Dr. Mitchell for a follow-up appointment.  She had returned to work.  Dr. Mitchell opined that some of her back and neck pain was related to stress and anxiety about her work.  The Plaintiff reported that Dr. Frank Lange had given her an

impairment rating of 11, and Dr. Mitchell opined that this was a satisfactory rating. He released the Plaintiff to see Dr. Willis for further steroid injections and stated that he would see her again when the course of injections had finished. (Tr. 136). On the same day he filled out a work excuse form for the Plaintiff with a diagnosis of cervical/lumbar sprain stating that she could return to regular duty on May 6, 1997. (*Id.* at 207).

On May 28, 1997, Dr. Mitchell filled out a form for Boyett asking that she be excused from work on Thursday, May 29 and Friday, May 30. (Tr. 206).

On June 9, 1997, Boyett was seen by Dr. Mitchell complaining of back pain between the scapula and the shoulder blades. He found very little in terms of significant pain or swelling in the shoulders. He diagnosed a chronic mild fascitis and noted that Dr. Willis planned to do facet injections in the Plaintiff's cervical spine, a course of action to which Dr. Mitchell was agreeable. (Tr. 133). On that same day, Dr. Mitchell wrote a letter indicating that, while he had found Boyett to be 0% disabled, he believed that the opinion of Dr. Frank Lange, who had rated the Plaintiff 11% disabled, should be given precedence over his own. (*Id.* at 135-34). On the same day he filled out a work excuse form for the Plaintiff with a diagnosis of lumbar sprain stating that she could return to regular duty on June 10, 1997. (*Id.* at 205).

On July 25, 1997, The Plaintiff underwent a left cervical facet steroid injection under the care of Dr. Willis. Her diagnosis before and after the procedure was cervical facet syndrome and myofascial pain syndrome. (Tr. 223).

On July 29, 1997, Dr. Mitchell filled out a work excuse form for the Plaintiff indicating that she had a lumbar sprain and that she required neck shots. The form stated that the Plaintiff would be able to return to regular duty on August 4, 1997. (Tr. 202).

10

On August 11, 1997, the Plaintiff was seen by Dr. Mitchell for a follow-up examination. She was tearful and crying and complained of pain in her upper neck, shoulders, and back. He suggested that she have rehab care and chronic pain management to reduce her pain and the frequency of being off work. He opined that she might also need the services of a psychiatrist. He further opined that she had reached maximum medical improvement and that he anticipated that she would return to work, although he took her off work for one week. (Tr. 132). On the same day he filled out a work excuse form for the Plaintiff with a diagnosis of lumbar sprain stating that she could return to work on August 18, 1997. (*Id.* at 201).

On August 18, 1997, Boyett saw Dr. Mitchell for a follow-up examination. She stated that her pain was somewhat less, but that she still had some stiffness and soreness in her neck. Dr. Mitchell opined that "there were a lot of emotional and stress problems related to this." He believed that the Plaintiff would need the services of a rehab nurse at some point in her convalescence. He scheduled a follow-up appointment in a month and stated that the Plaintiff could resume work on August 25, 1997. (Tr. 131). On the same day he filled out a work excuse form for the Plaintiff with a diagnosis of lumbar sprain stating that she could return to regular duty on August 25, 1997. (*Id.* at 200).

On September 29, 1997, the Plaintiff saw Dr. Mitchell complaining of neck and back pain. She reported that she had been fired from her job. It was noted that the Plaintiff had asked for a work statement, but the Dr. Mitchell was out of the country and had not given her one, although he would have had he been aware of the problem. He told the Plaintiff to follow up with the psychiatrist and that he would see her again in six weeks. (Tr. 130).

11

On November 12, 1997, Boyett saw Dr. Mitchell for a follow-up examination. He opined that her back problems and symptoms were somewhat related to the stress of her then current job. She reported that she was taking Elavil and that it was making her sleepy. Dr. Mitchell noted that Elavil is a very sedating medication that can make a patient wake up with a "hangover." It was his opinion that the Plaintiff needed to see a psychologist or psychiatrist. (Tr. 128-27).

On November 18, 1997, Dr. Willis wrote a "To Whom It May Concern" letter stating that the Plaintiff had received an injection on July 25, 1997 and was unable to attend work the following Monday because of pain. (Tr. 222).

On November 21, 1997, the Plaintiff saw Dr. Mitchell for a reevaluation. She complained of pain in her shoulder and arm. She had tightness and spasm in her right shoulder, but "not much in terms of severe weakness." Dr. Mitchell opined that this was a recurrence of the Plaintiff's underlying spasmodic problem and that the Plaintiff should be treated conservatively. (Tr. 129).

On February 6, 1998, the Plaintiff saw Dr. Mitchell for a reevaluation. He noted that her condition was unchanged and he found nothing essentially different in his examination. No change was made in her treatment plan. (Tr. 126).

On March 25, 1998, Boyett was seen by Dr. Mitchell and complained of pain in her neck and back, headaches, dizziness, and stiffness in her neck. Dr. Mitchell referred her to Dr. Kaboli for a neurological evaluation and stated that he would see the Plaintiff after she had seen Dr. Kaboli. (Tr. 125).

On May 1, 1998, the Plaintiff was seen by Dr. Mitchell complaining of severe back pain, neck pain, stiffness, swelling of her back, headaches, and dizziness. She stated that, over the past year, she had various treatments and medications prescribed for the pain. Dr. Mitchell noted that

the Plaintiff's neck was very tight and that she had some swelling around the neck and shoulder. He further noted that she had restriction of flexion and extension, and speculated that this was primarily due to pain and inflamation. Dr. Mitchell referred the Plaintiff to Dr. Kaboli, a neurologist, for a determination of whether her pain had structural or other causes. (Tr. 124).

On July 24, 1998, Boyett was seen by Dr. Mitchell. He had previously referred her to a neurologist, Dr. Kaboli. However, she and the neurologist had a personality conflict, and the neurologist felt that many of her difficulties were psychological. Dr. Kaboli had prescribed medication, but Boyett never had them filled. Dr. Mitchell noted that he had previously attempted to refer the Plaintiff to a psychologist with no success. He referred her to Dr. Cowens, another neurologist. (Tr. 122).

On September 15, 1998, the Plaintiff was seen by Dr. Kevin E. Cowens, Sr., M.D., complaining of neck pain and headaches. She reported that, on March 1, 1996, at work, some items had fallen on her chest, causing her to jump back and "catch herself" with her right arm. Later that day she developed neck pain and then started having headaches. She also started having low back pain. She reported that her low back pain was better, but that she has constant headaches with a "bad one" every once in a while, upper back spasms, and bilateral numbness in her arms when she uses them. She reported that she had three cervical epidural steroid injections and that they had helped some and that she had some physical therapy with various degrees of relief. She was then

taking Soma,[1] Fiorpap, and Diclofenac.[2]  Dr.  Cowens diagnosed the Plaintiff with cervical strain, cervical radiculitis[3] (bilaterally), headaches secondary to cervical strain, and lumbar strain (resolved).  He prescribed conservative care, with EMG and nerve conduction studies of the upper extremities, an MRI scan of the cervical spine, a trial of percutaneous[4] electrical nerve stimulation for pain control, Neurontin,[5] and a follow up appointment in six weeks.  (Tr.  82-84).

On October 23, 1998, the Plaintiff was seen by Dr.  Mitchell.  She reported persistent neck, shoulder, and back pain.  Dr.  Mitchell recommended MRIs of the cervical and thoracic spine and noted that he would see her again after those studies were done.  (Tr.  121).

On December 30, 1998, Boyett was seen by Dr.  Mitchell for a follow-up examination. There had been a request for an MRI of the Plaintiff's neck, which the insurance company had denied.  Dr. Mitchell stated that the Plaintiff should in fact have an MRI because she was in so much pain that she was unable to function, was unable to lift heavy objects, and was unable to do any work.  In view of an abnormal EMG, he felt that it was medically necessary for the Plaintiff to have an MRI done.  He renewed the Plaintiff's pain medication.  (Tr.  199).

---

[1]A muscle relaxant used to relax muscles and relieve pain and discomfort caused by strains, sprains, and other muscle injuries.  MedlinePlus *at* http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a682578.html.

[2]Used to relieve the pain, tenderness, inflammation, and stiffness caused by osteoarthritis and rheumatoid arthritis and ankylosing spondylitis.  MedlinePlus *at* http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a689002.html.

[3]Inflamation of a spinal nerve root.  *See* Dictionary.com *at* http://dictionary.reference.com/search?q=radiculitis.

[4]Effected through the skin.  Dictionary.com *at* http://dictionary.reference.com/search?q=percutaneous%20.

[5]Used to treat certain seizures, as well as some other conditions.  MedlinePlus *at* http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a694007.html.

On February 17, 1999, Dr. Mitchell wrote a letter to the Plaintiff's insurance company detailing her need for an MRI. He indicated that the Plaintiff "was still having a tremendous amount of pain, tingling, and numbness in the left arm and shoulder." (Tr. 198).

On February 19, 1999, Dr. Mitchell wrote a "To Whom It May Concern" letter on behalf of Boyett. In it, he described the Plaintiff's pain as "unrelenting and persistent." (Tr. 120).

On May 10, 1999, the Plaintiff was seen by Dr. Mitchell. She complained of severe neck pain, shoulder pain, pain in the back of the head, and upper, thoracic, and lower back pain. Dr. Mitchell opined that the Plaintiff's pain problems were chronic and that she had psychological issues secondary to the pain. (Tr. 117-19).

On May 18, 1999, Dr. Mitchell wrote a letter to Boyett's insurance company. In it he stated that she needed further treatment and studies, including Elavil,[6] which had been refused. The letter indicated that he intended the Elavil for both pain management and depression. He also stated that the Plaintiff's pain was a chronic problem. (Tr. 116-14).

On July 20, 1999, Boyett saw Dr. Mitchell. She complained of significant neck pain, soreness and stiffness of her neck, and pain on movement of her upper back and upper shoulder. Dr. Mitchell found mild to moderate tenderness of the upper spine, tightness and spasm in her muscles, and some stiffness in her neck. He diagnosed an ongoing degenerative or herniated disc of the thoracic spine and again recommended that the Plaintiff have an MRI of the upper thoracic spine, even though said procedure had previously been denied. (Tr. 113). On the same day, Dr.

---

[6]A tricyclic antidepressant, used to treat symptoms of depression. MedlinePlus *at* http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a682388.html.

Mitchell filled out a form for the Plaintiff that indicated that she should be excused from work, that she had been discharged from treatment, and that she should see him again as needed.  (*Id.* at 197).

On September 20, 1999, the Plaintiff saw Dr. Mitchell. She complained of severe neck and shoulder pain, headaches, pain in the left scapular area, numbness of her left arm, and restricted movement of her left arm. Dr. Mitchell noted that her clinical findings were unchanged from previous visits. Dr. Mitchell speculated that the Plaintiff's problems were caused by cervicothoracic disc syndrome, cervical radiculopathy. He also noted that Boyett had some underlying depression problems. One of the doctors hired by the Plaintiff's worker's compensation had recommended an independent evaluation, and Dr. Mitchell referred her to two doctors' offices for an evaluation. (Tr. 111-12).

On October 25, 1999, the Plaintiff was seen by Dr. Gary L. Tunell, M.D. at the request of Dr. Mitchell. In a letter to Dr. Mitchell, Dr. Tunell noted that the Plaintiff complained of back pain and headache, mid thoracic pain, and numbness in her hands. She reported that she felt that her symptoms had worsened over the past three years. She was then currently taking Duran about five times a week for headache and Soma 2-3 times a week for muscle pain. She had previously had trigger point injections by an anesthesiologist which had helped her neck pain, although she had not had them done for her thoracic pain. Dr. Tunell opined that Boyett should have a thoracic MRI to rule out a herniated disc secondary to her 1996 injury. If the MRI was negative, Dr. Tunell recommended that the Plaintiff take a tricyclic antidepressant to assist her in her sleep; he believed that her lack of quality sleep significantly contributed to her headache disorder. (Tr. 220-21).

On November 3, 1999, Boyett saw Dr. Mitchell. He noted that the Plaintiff had recently seen Dr. Gary Tindel (sic),[7] who agreed that the problem might lie in the Plaintiff's thoracic spine. Dr. Mitchell noted that Plaintiff's findings consisted of severe spasm in the upper back, severe pain, and numbness and tingling around the upper back, arms, and neck. He stated that the Plaintiff needed a repeat cervical MRI and thoracic MRI, but that her insurance company continued to deny them. (Tr. 109-08).

On December 1, 1999, the Plaintiff saw Dr. Mitchell. She continued to complain of neck, back, and shoulder pain. Dr. Mitchell indicated that his findings were unchanged from previous examinations. His records reflect that he believed the problem to be in the Plaintiff's thoracic spine and that the Plaintiff's insurance company had denied his request for an MRI of that area. The Plaintiff's medications were renewed and she was to see him again in one month. (Tr. 107).

On January 18, 2000, Boyett saw Dr. Mitchell. She complained of ongoing pain and an inability to do her normal work activities. She also complained that her insurance company continued to deny medication, treatment, and diagnostic tests. Dr. Mitchell noted that his findings were the same as in previous documentation and records. Dr. Mitchell instructed the Plaintiff to continue her then current medications. The Plaintiff indicated to him that she was thinking of applying for Social Security disability and he told her that he would be happy to provide medical records for this visit. (Tr. 106).

On February 28, 2000, the Plaintiff saw Dr. Mitchell. She complained that she was still having a great deal of pain in her upper back and thoracic spine and neck which was becoming

---

[7]This note apparently refers to Dr. Gary L. Tunell. Dr Mitchell's notes also identify him as Dr. Tinel, but unless otherwise noted the court will identify him as Dr. Tunell.

increasingly severe.  She also complained of numbness and tingling in her upper back, arms, and legs.  Dr.  Mitchell noted that he had previously requested a thoracic MRI, but that the Plaintiff's insurance had refused it.  He asked her to appeal this process and to see him again in six weeks to a month.  (Tr. 105).

On May 24, 2000, Dr.  Mitchell wrote a letter to the Plaintiff's insurance company attempting to justify her need for a thoracic MRI scan.  The letter also noted that the Plaintiff needed psychiatric help to cope with her chronic pain and that the insurance company had denied that as well.  (Tr. 101-02).

On August 23, 2000, Dr.  Mitchell wrote a letter to the Medical Dispute Resolution Center of Texas Worker's Compensation Commission requesting that Boyett be given a thoracic MRI and a psychiatric evaluation.  (Tr. 103).

On September 29, 2000, the Plaintiff had an MRI of the thoracic spine.  It was normal, with no bone or disc abnormality noted.  (Tr. 92-93).

On March 26, 2001, Boyett saw Dr.  Tunell for a follow-up visit.  She reported that she was still in pain and that epidural[8] steroids had not been helpful.  She slept on a heating pad and only got 3-4 hours of sleep a night.  Dr.  Tunell prescribed Neurontin to help her sleep and suggested that she use the TENS unit.  He also opined that her other doctors should be able to manage her routine care and that he would see her again only at their express request with a specific question.  (Tr. 219).

On June 20, 2001, Boyett saw Dr.  Mitchell.  She reported that she continued to have intermittent neck and back pain.  He noted that she had restricted motion of the upper cervical spine

---

[8]A space in the spine into which injections are given.  *See* Dictionary.com *at* http://dictionary.reference.com/search?q=epidural.

and muscle spasm in the thoracic upper neck and back, restricted motion of the cervical spine, and marked tenderness of the upper back.  Dr. Mitchell recommended that she continue the medications prescribed by Dr. Tunell and see him again as needed.  (Tr. 97).

On August 24, 2001, the Plaintiff saw Dr. Mitchell.  She reported persistent pain in the upper back.  He recommended that she continue on her then current medications with the addition of Soma. (Tr. 96).

On November 12, 2001, Dr. Mike M. Lee, M.D., saw Boyett and performed an Internal Medicine Consultive Examination on her.  His diagnostic impression was of chronic cervical pain and chronic low back pain.  He noted that the Plaintiff was able to sit and stand throughout the entire duration of the examination, was able to handle objects and speak well, and had no problem walking into or out of the clinic.  The range of motion of the lumbar spine was 90 degrees and extension of 20 degrees.  There was no back instability or circulatory deficits.  There was no significant motor loss and the neurological examination was intact.  There was no loss of motion in the upper extremities.  Boyett's weight bearing prognosis was poor due to her back problem.  Her gait was normal and she had no problems with using her hands to feel or reach.  (Tr. 146-49).  On the same date, David Head, RT, examined five views of the Plaintiff's lumbar spine.  He opined that there might be some mild degree of lumbar muscle spasm, early degenerative disc disease at level 3-4, and he noted that Boyett might warrant MR scanning of her lumbar spine if there were radicular symptoms to suggest early disc herniation.  (*Id.* at 150).

On November 28, 2001, Dr. Richard L. Vera, M.D., performed a consultive examination of Boyett at the request of Dr. Mitchell.  She complained of constant pain of variable intensity in her neck, in the bilateral trapezius region, in her upper thoracic spine, and in the lumbar spine.  Dr.

Vera noted that her symptoms included decreased sexual interest, headaches, nervousness, mood swings, difficulty breathing, weakness, and numbness. His impression was cervical strain, lumbar strain, and headaches. He recommended an interdisciplinary approach to getting the Plaintiff's pain to a more manageable level. He felt that it was medically necessary for the Plaintiff to have a multidisciplinary psychological evaluation to help determine what treatment program to pursue. (Tr. 185-86).

On December 10, 2001, Dr. Gurjeet S. Kalra, M.D. performed a psychiatric evaluation of the Plaintiff at the request of the Texas Rehabilitation Commission. He diagnosed her with major depression, moderate and gave her a GAF of 45-50. He stated that her prognosis was guarded and that she could probably benefit from treatment for depression by a medical health care professional. (Tr. 142-44).

On December 13, 2001, Dr. Tunell sent a letter to Boyett's insurance company describing his recent appointment with the Plaintiff. He opined that the Plaintiff had a tension headache as a result of her cervical strain syndrome. She complained of severe and unrelenting pain in her shoulders and neck bilaterally, extending to the lower back. She was then currently on Soma and Midrin, neither of which she reported as helping. She reported that she slept poorly and was awakened by pain. Dr. Tunell noted that, to his knowledge, all of her studies had been normal. Boyett reported that Dr. Mitchell had recommended that she apply for Social Security benefits because she has been resistant to all treatment provided. On examination, Dr. Tunell noted that she complained of pain but that her range of motion was not significantly decreased. He opined that the Plaintiff might suffer from fibromyalgia and recommended that she see a rheumatologist. He

discontinued her prescriptions of Soma and Midrin and substituted Pamelor for sleep and Vioxx for pain.  She was advised to continue her exercise regimen.  (Tr.  218).

On January 7, 2002, Dr.  Richard J.  Alexander, M.D. filled out a Psychiatric Review Technique on Boyett based on her previous medical records.  In it he found that a Residual Functional Capacity Assessment ("RFC") was necessary.  He opined that her major depression, moderate did not precisely satisfy the criteria under Listing 12.04 Affective Disorders.  (Tr.  155). Her functional limitations were rated mild, and there were no repeated episodes of decompensation. (*Id*.  at 162).  He noted that Plaintiff had no history of psychiatric treatment with medications, counseling, or hospitalization.  Her concentration and memory were fair to poor, her insight was limited, and her judgment was fair.  Her thought processes were generally organized and goal directed, her mood was depressed, and her affect was irritable and angry.  He further noted that, "[a]lthough depressed, she is able to maintain routine activities, only limited by her physical problems."  (*Id.*  at 164).  On the same day Alexander filled out an RFC for Boyett.  He found that she had moderate impairment in her ability to understand and remember detailed instructions, carry out detailed instructions, maintain attention and concentration for extended periods, sustain an ordinary routine without special supervision, and the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods.  In elaborating on Boyett's capacities, he stated that the Plaintiff had fair to poor concentration and memory, but that her thought processes were organized and goal-directed.  He opined that she retained the ability to perform complex but not detailed work and was able to cooperate with her peers, accept supervision,

and adapt to changes in the work setting.  (*Id.  at*  166-68).  On May 22, 2002, Farrell A.  Hillman reviewed Plaintiff's records and affirmed the assessments made by Dr.  Alexander.

On January 8, 2002, Dr.  Frank H.  Gregg, M.D., filled out an RFC of Boyett's physical capacities based on her medical records.  His diagnosis was lumbar spasm, mild.  He opined that the Plaintiff could occasionally lift 50 pounds, frequently lift 25 pounds, stand and/or walk for approximately 6 hours in an 8 hour workday, sit about six hours in an eight hour workday, and had unlimited ability to push and pull.  He opined that she could frequently climb, balance, crawl, or kneel and occasionally stoop or crouch.   He found no manipulative limitations, no visual limitations, no communicative limitations, and no environmental limitations, and concluded  that the "alleged limitations, secondary to symptoms, [were] not fully supported by the [evidence of record]." (Tr.  170-77).

On February 1, 2002, Boyett saw Dr.  Mitchell complaining of persistent neck and back pain. The Plaintiff reported that she had seen Dr.  Tunell and that he had opined that she would need to see a rheumatologist.  Dr.  Mitchell opined that the Plaintiff had developed fibromyalgia of her arms, neck, and shoulders.   She had pain and tightness around the scapula, the rhomboideus muscle, and the paravertebral muscles.  She had no definitive neurological deficits.  Dr.  Mitchell recommended that the Plaintiff see him again after she had consulted a rheumatologist.  (Tr.  194).  On the same date he filled out a Texas Worker's Compensation Status Report for the Plaintiff.  In it, he stated that a neck sprain and a sprain of the lumbar region prevented the Plaintiff from returning to work as of February 1, 2002.  He did not identify a date on which the Plaintiff could be expected to return to work.  (*Id.*  at 195).

22

On April 4, 2002, Dr. Timothy Clark, Ph.D. wrote a letter to Dr. Hoyne indicating that The Plaintiff had completed two weeks of his pain management program, attending 9 of 10 days. He noted that she was slow to begin making progress, but that she had begun making substantial progress in all areas. She had decreased her muscle tension by 50%, maintained hand temperature at 93 degrees, and reduced electrodermal responses by 40%. In physical therapy, she had made a 20% improvement on functional repeated assessment of strength, improved approximately 50% on lifting tasks, and improved 25% in speed and endurance in ambulation. She also made good progress in tasks involving repetitive strength and occupational therapy. Dr. Clark recommended that the Plaintiff continue her therapy for an additional two weeks. (Tr. 180-81).

On April 11, 2002, Dr. Vera's notes reflect that a team conference with regard to Boyett was held. It was reported that the Plaintiff was doing well in biofeedback, physical therapy, and counseling and it seemed that she was making some progress in the program. (Tr. 179).

On April 12, 2002, Dr. Vera's notes reflect that the Plaintiff had completed four weeks of the comprehensive interdisciplinary pain program. Dr. Vera noted that the Plaintiff had initially made slow progress, but she began to notice significant progress as the program progressed. The Plaintiff stated that her pain was more manageable and had no new complaints. Dr. Vera's notes indicate that they will continue with an interdisciplinary approach to the Plaintiff's pain management. (Tr. 178).

On April 30, 2002, the Plaintiff saw Dr. Mitchell, who noted that she had been referred to the pain management center at Baylor and was going through their program. She reported that she was seeing another physician and a psychiatrist. She had been taking medication and complained of pain and stiffness in her neck. Dr. Mitchell offered to refer the Plaintiff to a

psychologic/psychiatric treatment program which she refused.  He recommended that she continue to see her psychiatrist and to see him as needed; no medications were dispensed.  (Tr.  193).

On July 26, 2002, Boyett was seen by Dr.  Mitchell complaining of upper neck pain and back pain, essentially unchanged from previous visits.  The Plaintiff complained that she had trouble using her left arm for reaching or lifting.  The Plaintiff was referred back to Dr.  Tunell for her headaches and to Dr.  Singhal, a rheumatologist.  Dr.  Mitchell opined that the Plaintiff would improve with time and did not prescribe any pain medication or muscle relaxants.  The Plaintiff was to see him again after visiting the other two doctors.  (Tr.  192).

Also on July 26, 2002, Dr.  Mitchell wrote a "To Whom It May Concern" letter stating that the Plaintiff had been under his care since 1998 regarding a back problem, following an injury in March 1996.  In the accident she sustained injury to her upper thoracic and cervical spine.  While in treatment, the Plaintiff also developed fibromyalgia.  He noted that Boyett had extensive pain treatment including injections, psychiatric treatment, medications, physical therapy, and rheumatologic evaluation and that none of these had helped her condition.  He opined that the Plaintiff had severe back pain, upper back pain, weakness, stiffness, and loss of function and that she was unable to return to "any kind of useful occupation because of the chronic pain."  He noted that "[t]here are also problems with the requirements of her ongoing constant medication."  (Tr.  190).

On September 10, 2002, Dr.  Tunell wrote a letter to the Plaintiff's insurance company summarizing her follow-up appointment with him on that day.  She was then taking Soma and

Vioxx.  Boyett continued to complain of occipital[9] headaches, neck pain, and continuous bilateral shoulder pain.  She was unable to assume a comfortable position.  Her headache was not associated with neurological deficits such as dizziness or los of vision, but did sometimes produce insomnia.  He had previously recommended that the Plaintiff see a rheumatologist, as had Dr. Mitchell, but a referral had not been completed.  Dr. Tunell suggested trying Flexril for Boyett's muscle tightness across the shoulders, as he believed that her headaches were a consequence of her neck and shoulder pain.  He recommended again that the Plaintiff be evaluated by a rheumatologist, and stated that he did not believe that further consultations with Boyett would be helpful to her.  (Tr. 217).

On October 30, 2002, the Plaintiff saw Dr. Mitchell.  He noted that she was last seen on June 26, 2002 and that her symptoms remained the same.  Dr. Mitchell diagnosed her with "chronic upper back pain and many multiple problems as well."  He referred her back to Dr. Tunell and again recommended that she see a rheumatologist, with a follow-up visit in three months.  (Tr. 189).

On November 6, 2002, Dr. Mitchell filled out a residual functional capacity assessment on Boyett, indicating that, in his opinion, her physical capacities were limited to lifting and/or carrying 6-10 pounds, standing and/or walking less than 2 hours per regular work day, and sitting 2-4 hours of a regular work day, with alternations between sitting and standing every 10 minutes.  He opined that she could perform simple grasping or fine manipulation with either hand, but could not perform pushing or pulling.  He opined that she could not perform foot controls while sitting or standing.  He opined that she could occasionally drive, but that she could never climb, balance, stoop, kneel, crouch, crawl, push, or pull.  She could not perform work involving moving machinery or heights.

---

[9]"Of or relating to the occipital bone." Dictionary.com *at* http://dictionary.reference.com/search?q=occipital.

He opined that the Plaintiff was not able to perform her past work activity and had been so limited since March 1, 1996.  His diagnosis was that Boyett had moderate thoracic strain and severe fibromyalgia.[10] For objective signs of pain, he checked X-ray and muscle spasm.  He opined that her pain was "Moderate could be tolerated but would cause marked Handicap in the performance of the activity recipitating Pain."  (Tr.  268-71).

The Plaintiff testified on her own behalf at the Administrative hearing.  She testified that she lived with her husband and her nineteen-year-old son, both of whom worked during the day.  Her daughter came over nearly every day to help her with chores.  She last worked in 1997.   She was fired from that job for missing too many days.  She testified that she had a stabbing pain in her back and that the medication she took sometimes made her tired.  She had bad spasms in her cervical back and it sometimes "popped out."  Activity made the pain worse.  She testified that if she sat down for very long, her medications would put her to sleep about half of the time.  She further testified that she could sleep no more than 3-4 hours a night without the aid of sleeping pills, which she occasionally failed to take because she did not like the way they made her sleep.  She was self-sufficient with regards to personal care.  She and her husband visited their parents on the weekends and she occasionally went to visit her grandchildren.  She testified that activities like laundry and vacuuming increased her pain.  She stated that she could not pick up her grandchildren because it caused too much pain and she did not have the strength to do so.  Approximately every other day the pain in her back was so bad that it caused her to cry.  She continued to have numbness and tingling in her arms.  She had muscle spasms every day.  She relieved her pain by lying on a heating pad; some days all she did was lie on the pad.  (Tr.  280-99).

---

[10]He also opined that the Plaintiff had moderate cervical "Redicbles."  (Tr.  271).

In three grounds for relief, Boyett complains that the Commissioner failed to apply the proper legal standard to weigh the opinion of her treating physician, failed to properly consider the Plaintiff's mental impairment as a severe impairment, and erroneously found that Boyett is capable of returning to her past occupation as a cashier, which decision is not supported by substantial evidence.

With respect to her first ground, although the "opinions, diagnosis, and medical evidence" of a "treating physician" should be accorded considerable weight in the determination of disability, *e.g.*, *Barajas v. Heckler*, 738 F.2d 641, 644 (5th Cir. 1984), when good cause is shown, little or no weight need be given to a treating physician's statements that are "brief and conclusory ... or otherwise unsupported by evidence." *Greenspan*, 38 F.3d at 237.  A medical opinion on the issue of disability must be more than the bare statement that the plaintiff is disabled and must be supported by clinical or laboratory findings. *Oldham v. Schweiker*, 660 F.2d 1078, 1084 (5th Cir. 1981). Further, opinions as to the fact of disability by physicians are legal conclusions which are matters reserved to the Commissioner. *See Frank v. Barnhart*, 326 F.3d 618, 620 (5th Cir. 2003).

It is clear that the ALJ considered Dr. Mitchell's treatment notes and the doctor's opinions. (Tr.13-15).  In rejecting the doctor's opinion as to the severity of her impairments the ALJ made specific reference to his RFC dated November 6, 2002.  (*Id.* at 268-71, identified in the decision as page 110).  Although the ALJ did not specifically identify Dr. Mitchell's own records which contradicted the above, the record reflects that Dr Mitchell previously found that the Plaintiff's thoracic pain was not a major problem and that he anticipated her return to full work status in December 1996.  He subsequently released her to full work status on January 13, 1997, but gave her medical excuses periodically.  His notes also show that he gave medical releases to permit her to

return to work in March and August 1997.  In June 1997 he advised that he found Boyett's disability at 0%.  All of these data are contradictory to his November 2002 RFC that she had all the listed impairments since the date of the accident on March 1, 1996.  Further, his December 30, 1998 follow-up examination provides no basis for his conclusion.  The primary focus of this report is the insurer's  refusal to obtain an MRI scan.  Dr. Cowens who saw Plaintiff on September 15, 1998 recommended consultive care and an MRI was ultimately done on September 29, 2000 - the results of which were normal.  (Tr. 92-93).  The record provides an ample basis for the ALJ's decision to reject Dr. Mitchell's opinions with respect to the severity of her impairments. *See, e.g., Legett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995).

In her second ground for relief, the Plaintiff contends that the ALJ erred in determining that her mental impairments were non-severe.  Boyett did not allege a mental impairment in her application for disability benefits.  The administrative record contains two psychiatric evaluations - one performed by Dr. Gurjeet S. Kalra, M.D. on December 10, 2001 and a second by Dr. Richard Alexander, M.D. on January 7, 2002 based upon the medical records provided by Boyett.  Dr. Kalra opined that she suffered moderate major depression and rated her then current GAF at 45-50.  Dr. Alexander noted that she had never been treated for any psychiatric disorders, and although he determined that she was depressed, she was able to maintain all of her routine activities, limited only by her physical impairments.

The ALJ found that her depression was non-severe.  (Tr. 14).  On a number of occasions from August 1, 1997 to August 23, 2000, Dr. Mitchell recommended that Plaintiff be evaluated by a psychiatrist and/or that she receive active psychiatric care as a component of treatment for her physical condition.  This recommendation was concurred in by Dr. Vera, after she was referred by

28

Dr. Mitchell, following Vera's examination on November 28, 2001. She commenced an interdisciplinary therapy program at the Baylor Center for Pain Management in mid-March 2002, which resulted in good progress. Both Plaintiff and Dr. Vera felt that she was doing well in the program after four weeks. On April 30, 2002, Plaintiff reported to Dr. Mitchell that she was then seeing a psychiatrist. However she declined his offer to place her in a psychologic/psychiatric treatment program. There is no record of any subsequent psychiatric/psychological treatment.

The record supports the ALJ's determination that her depression was not severe, *See Harrell v. Bowen*, 862 F.2d 471, 481 (5th Cir. 1988), and his finding that the pain management program in which she participated in early 2002 was beneficial. "A medical condition that can reasonably be remedied by ... treatment is not disabling." *Lovelace v. Bowen*, 813 F.2d 55, 59 (5th Cir. 1987).

In her third ground for relief, The Plaintiff contends that the ALJ erred in determining that she could perform her past relevant work as a cashier. The Plaintiff contends that there was no evidence that her past relevant work as a cashier was done at the unskilled level. However, Boyet has the burden to prove an inability to perform her former work. *See Villa v. Sullivan*, 895 F.2d 1019, 1023 (5th Cir. 1990); *Hollis v. Bowen*, 837 F.2d 1378, 1386 (5th Cir. 1988). There is substantial evidence to support the ALJ's RFC (Tr. 16 ¶ 7), and therefore this ground is without merit.

There is substantial evidence to support the ALJ's decision that the Plaintiff was able to perform her past relevant work, on or prior to the date on which her insured status expired. Defendant is entitled to summary judgment.

It is therefore ordered that the Commissioner's Cross Motion for Summary Judgment is granted.

SIGNED this 24th day of August,  2005.

_____
Wm. F. Sanderson, Jr.
UNITED STATES MAGISTRATE JUDGE